**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **A.H.,** *et al.,* | * | |
|   **PLAINTIFFS,** | * | |
| **v.** | * | **Case No.: PWG-18-243** |
| **JACK R. SMITH,** *et al.,* | * | |
|   **DEFENDANTS.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

A.H., a minor, by and through his Parents, J.H. and E.H. ("Parents"), who also joined their son as Plaintiffs, filed suit against Jack R. Smith in his official capacity as Superintendent of Montgomery County Public Schools ("MCPS") and Montgomery County Board of Education ("the Board"). Compl., ECF No. 1. Plaintiffs claim that Defendants failed to provide A.H., who has Autism, Common Variable Immune Deficiency, and Pediatric Acute Onset Neuropsychiatric Syndrome, with the Free Appropriate Public Education ("FAPE") to which he is entitled under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Compl. ¶ 146. They ask the Court to reverse the decision of the administrative law judge ("ALJ") who reviewed A.H.'s individualized education programs ("IEPs") and proposed placements for the 2015-18 school years and concluded that they provided an appropriate education for A.H. in the least restrictive environment, as required by the IDEA. *Id.* ¶¶ 92, 140–42, 150.

According to Plaintiffs, the IEP for the 2015-17 academic school years fell short because it included "lunch and recess in the general education setting," which offered no educational benefit to A.H. and presented safety concerns "given [A.H.'s] significant behavioral

dysregulation." Compl. ¶¶ 52–53. Plaintiffs also argued that the level of staffing at the proposed placement, Bells Mill Elementary School ("Bells Mill"), was inadequate to meet A.H.'s needs. *Id.* ¶ 79. As for the 2017-18 school year, Plaintiffs challenged the IEP and proposed placement for A.H. at Cabin John Middle School ("Cabin John") as inadequate because of the "absence of clearly discernable behavioral intervention, inadequate staffing, isolation from peers in order to meet the hours of specialized instruction indicated in his IEP, and a lack of a safe and secure environment." *Id.* ¶ 78. In her opinion, the ALJ agreed with MCPS that A.H. was offered IEPs and placements that were reasonably calculated to provide him with a FAPE for all three school years, and denied the Parents the relief they requested, namely funding and placement from MCPS for A.H. at the Ivymount School ("Ivymount"). ALJ Dec. 43.

The parties have filed cross-motions for summary judgment. ECF Nos. 10, 14.[1] Plaintiffs argue that the ALJ erred in both her factual findings and legal analysis, including by "failing to properly assess the credibility of witnesses, especially when faced with school system witnesses who knew very little about A.H.," and completely ignoring the "majority of the specific concerns expressed by the parents' witnesses who knew A.H. about the proposed MCPS programs, as well as evidence of his response to the more intensive programming at Iymount." Pls.' Mem. 2. But, giving due weight to the ALJ's factual findings and from my own *de novo* review of the entire record, I find that the IEPs and the proposed placements were appropriate and reasonably calculated to provide A.H. with a FAPE for all three school years. Accordingly, I conclude that Plaintiffs are not entitled to judgment as a matter of law and Defendants are. Therefore, I will

---

[1] The parties have fully briefed cross-motions for summary judgment. ECF Nos. 10-1, 14-2, 15, 16. A hearing is not necessary. *See* Loc. R. 105.6.

deny Plaintiffs' Motion for Summary Judgment, grant Defendants' Cross-Motion for Summary Judgment, and close this case.

## Free Appropriate Public Education

Children with disabilities are entitled to a free appropriate public education, or "FAPE," pursuant to the IDEA. 20 U.S.C. § 1412(a)(1)(A). Maryland regulations also "govern[] the provision of FAPEs to children with disabilities in accordance with the IDEA." *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing Md. Code Regs. Tit. 13A, § 05.01). A FAPE is an education that provides "meaningful access to the educational process" in "the least restrictive environment" and is "reasonably calculated to confer 'some educational benefit'" on the child with a disability. *Id.* (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982)). "The benefit conferred . . . must amount to more than trivial progress," but "[t]he IDEA does not require that a school district provide a disabled child with the best possible education . . . ." *Id.* (citing *Rowley*, 458 U.S. at 192; *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)). Rather, a school must provide an Individualized Education Program ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (noting that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal").

To this end, each child with a disability must have an IEP that "state[s] the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will

be 'mainstreamed,' i.e., spend time in regular school classroom with non-disabled students." *M.C.*, 2014 WL 7404576, at *1 (citing 20 U.S.C. § 1414(d)(1)(A)); *see Endrew F.*, 137 S. Ct. at 994.

> The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe,* 484 U.S. 305, 311 (1988). A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. [20 U.S.C.] § 1414(d)(1)(B) (internal quotation marks omitted). These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. § 1414. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child. *Rowley,* 458 U.S., at 181.

*Endrew F.*, 137 S. Ct. at 994.

If the IEP team members disagree about the contents of an IEP, they can try to "resolve their differences informally, through a '[p]reliminary meeting,' or, somewhat more formally, through mediation," and if they do not reach agreement, they can participate in "a 'due process hearing' before a state or local educational agency." *Id.* (quoting 20 U.S.C. §§ 1415(e), (f)(1)(A), (B)(i), (g)). Then, "the losing party may seek redress in state or federal court." *Id.* (citing 20 U.S.C. § 1415(i)(2)(A)).

In Maryland, parents may voice disagreement with their children's proposed IEPs and request due process hearings before the Maryland Office of Administrative Hearings to address their concerns. *See M.C.*, 2014 WL 7404576, at *2 (citing 20 U.S.C. § 1415(b)(6), (f); Md. Code Ann., Educ. § 8–413; Md. Code Regs. Tit. 13A, § 05.01.15(C)(1)). "Any party can then appeal the administrative ruling in federal or state court." *Id.* (citing Educ. § 8–413(h)). Additionally, parents may place their children in a private school that is "appropriate to meet the child's needs" and "seek tuition reimbursement from the state," but only "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." *Id.* (quoting Title 20 § 1412(a)(1)(C)(iii); citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)) (emphasis from *M.C.* removed).

## Background[2]

Much of the background to this case is undisputed, as outlined in the stipulated facts submitted by the parties to the ALJ. *See* ALJ Dec. 4–6 ("Jt. Stmt. Facts"). A.H. is a twelve-year-old student residing in Montgomery County, Maryland. *Id.* ¶ 1. A.H. was diagnosed with Autism in 2008 and was later diagnosed with an accompanying intellectual disability (moderate) and language impairment. *Id.* ¶¶ 6, 12. A.H. exhibits significant and impairing symptoms of Autism, including delays in communication skills, social skills, behavioral regulation, and sensory processing. Dr. Ratto Eval. 7, Pls.' Ex. 6. A.H.'s presentation is further complicated by his subsequent diagnoses of Pediatric Acute Onset Neuropsychiatric Syndrome ("PANS") and Common Variable Immune Deficiency ("CVID"). Jt. Stmt. Facts ¶¶ 4, 7, 10; Dr. Ratto Eval. 9. A.H.'s doctor reported that these conditions "contribute to severely impairing compulsive behaviors and behavioral rigidity." Dr. Ratto Eval. 9.

Prior to moving to Montgomery County in 2015, Plaintiffs lived in Alexandria, Virginia. Nov. 8, 2017 Tr. 42:25–43:8. In 2007, at the age of two, A.H. was found eligible for early intervention by Plaintiffs' local school district, Alexandria City Public Schools ("ACPS"), and began receiving speech and occupational therapy services. Jt. Stmt. Facts ¶ 5; Nov. 8, 2017 Tr. 28:8–22. Then, from 2008 to 2010, A.H. attended non-categorial special education preschool programs through ACPS. Nov. 8, 2017 Tr. 28:8–38:1. The Parents withdrew A.H. from the ACPS preschool program in June 2010 and homeschooled him until 2015. *Id.*

---

[2] In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009). Where, as here, the Court is presented with cross-motions for summary judgment, the facts relevant to each motion must be considered in the light most favorable to the nonmovant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

In the spring of 2015, the Parents applied for A.H. to attend the Ivymount School in Montgomery County, Maryland. Nov. 8, 2017 Tr. 41:14–42:16. A.H. was accepted and began attending Ivymount in July 2015, at which time Plaintiffs were still living in Alexandria City, Virginia. Jt. Stmt. Facts ¶ 11; Nov. 8, 2017 Tr. 42:25–43:2. The Parents did not seek an IEP proposal from ACPS in 2015. Nov. 8, 2017 Tr. 92:2–9. However, the Parents retained an educational advocate, Suzanne Keith-Blattner, because they "wanted to keep [A.H.] at Ivymount," so they wanted to "see[ ] her thoughts on funding from Alexandria City Public Schools." *Id*. 88:15–90:22.

In November 2015, four months after A.H. began attending Ivymount, Plaintiffs moved to Montgomery County, Maryland. Jt. Stmt. Facts ¶ 13; Nov. 8, 2017 Tr. 43:3–8. Soon after, on December 11, 2015, the Parents contacted MCPS to begin the special education eligibility process for A.H. Jt. Stmt. Facts ¶ 13. The Parents provided a referral packet to MCPS at that time, which included medical evaluations of A.H., reports from Ivymount, and Ms. Blattner's report of her observation of A.H. at Ivymount. Nov. 8, 2017 Tr. 111:24–117:21.

## A. The 2016 IEP

On February 22, 2016, MCPS convened an IEP screening meeting for A.H.. Jt. Stmt. Facts ¶ 14. At the meeting, the IEP team reviewed the documentation provided by Plaintiffs and also considered a classroom observation report of A.H. completed by Lisa Shen, an MCPS special educator. Nov. 8, 2017 Tr. 122:20–124:16. MCPS found A.H. eligible for special education services as a student with Autism. Jt. Stmt. Facts ¶ 14.

After the meeting, the Parents and MCPS prepared to develop A.H.'s IEP. Specifically, the Parents hired Dr. Laura Solomon, an educational consultant, to assist with developing A.H.'s educational programming. Nov. 7, 2017 Tr. 31:17–34:15. She reviewed A.H.'s records and

observed him in his program at Ivymount. *Id.* For its part, MCPS sent a program specialist from its Autism Division, Tina Garland, to conduct a classroom observation of A.H. at Ivymount. Nov. 15, 2017 Tr. 34:3–23. In addition, MCPS psychologist Dawn Lester completed an assessment of A.H. on March 7, 2016, and MCPS physical therapist Jane Juliano conducted a clinical observation of A.H. on March 10, 2016. Jt. Stmt Facts ¶ 16; MCPS Physical Therapy Report, MCPS Psychological Report, Defs.' Exs. 21, 22.

Then, on April 15, 2016, the IEP team met to develop A.H.'s IEP. *See* 2016 IEP, Defs.' Ex. 25. The Parents and their attorney attended the meeting, along with Dr. Solomon and Kelsey Ruppel, a special education teacher at Ivymount. *See id.* at 69. The IEP team discussed the assessments of A.H. completed by MCPS specialists Lisa Shen, Jane Juliano, Dawn Lester, and Tina Garland, all of whom were present at the meeting. *Id.* The IEP team also received input from Kelsey Ruppel and Dr. Solomon regarding A.H.'s needs and his performance at Ivymount. *Id.* A.H.'s mother, E.H., testified that the development of the IEP was "a very collaborative process." Nov. 8, 2017 Tr. 45:2–9.

As a result of the meeting, an IEP was proposed for the remainder of the 2015-16 school year and for the upcoming 2016-17 school year ("the 2016 IEP"). Jt. Stmt. Facts ¶ 17; Nov. 8, 2017 Tr. 128:4–6. In relevant part, the 2016 IEP provides A.H. would receive "specialized instruction out of the general education setting for all academic areas," for a total of 22 hours and 30 minutes per week. 2016 IEP 50. It calls for a "highly structured classroom" and outlines a range of instructional supports to be implemented across the school day, including "1:1 instruction for new skill acquisition." *See* 2016 IEP 24–33. The IEP also provides A.H. would spend lunch and recess in the general education setting with "special education support," for a total of 5 hours per week. *Id.* at 50. In addition, among other services and supports, the 2016 IEP implements the

behavioral intervention plan ("BIP") developed by Ivymount and recommends 1.5 hours of speech therapy per week, 3.0 hours of physical therapy per quarter, and 30 minutes of occupational therapy per quarter. *Id.* at 30, 50.

The Parents and Dr. Solomon agreed with most of the 2016 IEP. Nov. 8, 2017 Tr. 173:9–24 (E.H.'s testimony that "[t]he IEP that was developed, we all agree with"). They only objected to A.H.'s inclusion in the general education setting for lunch and recess; they requested a fully self-contained program for A.H. 2016 IEP 61. In response, the MCPS team explained that they would take data when A.H. enrolled and then determine whether A.H.'s continued inclusion in the general education setting for lunch and recess was appropriate. *Id*.

MCPS proposed the Autism Program at Bells Mill Elementary School to implement the 2016 IEP. Jt. Stmt. Facts ¶ 17. Ms. Garland told the Parents that there is a 2:1 student-to-staff ratio at Bells Mill and that the students are taught at their instructional level. 2016 IEP 69. After conducting observations of the Program at Bells Mill, however, the Parents and Dr. Solomon concluded that the level of staffing at Bells Mill was inadequate for A.H., particularly during lunch and recess. Nov. 7, 2017 Tr. 117:5–118:6; Nov. 8, 2017 Tr. 48:11–51:25. The Parents and Dr. Solomon also believed that the instructional methods used at Bells Mill, including group instruction and assigning independent work, were inconsistent with A.H.'s learning abilities. Nov. 8, 2017 Tr. 48:11–51:25; *see also* Dr. Solomon Observation Report 3, Pls.' Ex. 23.

On June 9, 2016, the Parents sent MCPS reports from Ivymount outlining A.H.'s present levels of performance and requested an IEP meeting to discuss the new information. Jt. Stmt. Facts ¶ 19. In response to the Parents' request, the parties convened for a meeting on August 4, 2016. Jt. Stmt. Facts ¶ 20. The IEP team reviewed the information from Ivymount at the meeting, which demonstrated that A.H. had made progress on many objectives in his Ivymount IEP but

continued to elope and have tantrums. *See* Ivymount June 3, 2016 Report, Defs.' Ex. 41; Nov. 8, 2017 Tr. 137:2–16. The IEP team also reviewed a list of medical orders submitted by Dr. Teresa Fuller, A.H.'s general pediatrician, including her recommendation that a registered nurse be present in A.H.'s school building to respond to any changes in his medical condition. Dr. Fuller Report 2, Defs.' Ex. 34.

After considering the information and updating the 2016 IEP with A.H.'s present levels of performance, MCPS reaffirmed its proposal for A.H. to attend the Autism Program at Bells Mill for the 2016-17 school year.[3] Aug. 4, 2016 IEP, Pls.' Ex. 27. An MCPS Nurse Administrator informed the Parents that the directives from A.H.'s physician could be implemented at Bells Mill, but the Parents objected to the placement because it did not have a registered nurse on site throughout the school day.[4] *See id.* at 82. Thus, the following day, the Parents served notice of their intent to maintain A.H.'s enrollment at Ivymount for the 2016-17 school year and requested that MCPS place and fund him there. Jt. Stmt. Facts ¶ 21. MCPS declined the Parents' request and maintained that they had offered A.H. a FAPE. *Id.* ¶ 22.

## B. The 2017 IEP

On January 26, 2017, the Parents sent A.H.'s updated Ivymount IEP and present levels of performance to MCPS and requested a meeting to begin the IEP process for the 2017-18 school year, A.H.'s first year of middle school. Jt. Stmt. Facts ¶ 23. In turn, in preparation for developing

---

[3] Apart from updating the present levels of performance in the proposed IEP, the IEP team did not make any other revisions to the IEP developed at the April 15, 2016 meeting. *See* 2016 IEP, Defs.' Ex. 25; Aug. 4, 2016 IEP, Pls.' Ex. 27.

[4] The Parents withdrew this allegation at the due process hearing, however, and they do not now challenge the IEPs or proposed placements for failing to provide an R.N. on-site at all times. *See* ALJ Dec. 32 n.23.

the updated IEP, two program specialists from the MCPS Autism Division, Emily Stanley and Lauren McGinley, conducted observations of A.H. at Ivymount. Nov. 15, 2017 Tr. 177:7–24.

The Parents and MCPS met on April 4, 2017 to develop the updated IEP. Jt. Stmt. Facts ¶ 24. Ms. Stanley and Ms. McGinley from the MCPS Autism Division attended the meeting, along with MCPS occupational therapist Felicia Farag, MCPS physical therapist Jane Juliano, and MCPS nurse administrator Melinda McCartin. *See* 2017 IEP 80, Defs.' Ex. 57. The Parents were joined at the meeting by their attorney and two Ivymount staff members – Katie Quinn, the Ivymount Autism Division Director, and Kelly Matthews, the Head Teacher at Ivymount. *See Id.* at 2, 74. E.H. and Dr. Solomon both testified that the development of this IEP, like that of the prior IEP, was a collaborative process. Nov. 7, 2017 Tr. 166:16–22; Nov. 8, 2017 Tr. 45:2–9.

The IEP proposed at the April 4, 2017 meeting ("the 2017 IEP") is substantially similar to the 2016 IEP. In relevant part, the 2017 IEP calls for A.H. to "receive academic instruction in the special education setting outside general education," for a total of 22 hours and 50 minutes per week. 2017 IEP 54. It mandates a "highly structured classroom," a "low staff to student ratio," "close adult proximity at all times," and a variety of other instructional and behavioral supports. *Id.* at 29–34. Further, like the 2016 IEP, the 2017 IEP includes lunch and recess in the general education setting, for a total of 5 hours per week. *Id*. at 54. Among other services and supports, the 2017 IEP also implements the behavioral intervention plan ("BIP") developed by Ivymount and includes 1 hour of speech therapy per week, 3 hours of physical therapy per quarter, and 30 minutes of occupational therapy per quarter. 2017 IEP 54, 60.

The Parents and Dr. Solomon agreed with most of the 2017 IEP, but again opposed A.H.'s inclusion in the general education setting for lunch and recess. Nov. 7, 2017 Tr. 166:2–15; Nov. 8, 2017 Tr. 174:21–175:20 (E.H.'s testimony that "I agree with everything on the IEP except for

… [t]he gen ed piece."). They believed that lunch and recess in the general education setting presented safety risks for A.H. and offered no educational benefit. 2017 IEP 74. MCPS documented the Parents' concerns but concluded that "there is no data that would suggest the student cannot be included during lunch and recess." *Id.*

To implement the 2017 IEP, MCPS proposed the Autism Program at Bells Mill Elementary School for the remainder of the 2016-17 school year and the Autism Program at Cabin John Middle School for the upcoming 2017-18 school year, A.H.'s first year of middle school.[5] *See* 2017 IEP 56; Jt. Stmt. Facts ¶ 24. After the meeting, the Parents and Dr. Solomon conducted observations of the Autism Program at Cabin John and concluded that it was inappropriate for A.H. Nov. 7, 2017 Tr. 150:22–153:14; Nov. 8, 2017 Tr. 59:13–61:2. Specifically, the Parents and Dr. Solomon believed that the cafeteria at Cabin John presented safety risks for A.H. and that the level of staffing was inadequate to address his needs. *Id.* The Parents also expressed concerns about the electives at Cabin John, which are only formally offered in the general education setting. Nov. 8, 2017 Tr. 59:18–61:2. Thus, the Parents served notice of their intent to maintain A.H.'s enrollment at Ivymount for the 2017-18 school year and requested that MCPS place and fund him there. Jt. Stmt. Facts ¶ 27. MCPS declined the Parents' request and maintained that it had offered A.H. a FAPE. *Id.* ¶ 28.

On August 10, 2017, the Parents filed a due process hearing request challenging the appropriateness of the IEPs and proposed placements and seeking reimbursement for A.H.'s placement at Ivymount. Due Process Hr'g Req., Pls.' Ex. 1. A due process hearing was held on

---

[5] At Cabin John, A.H. would only spend thirty minutes in the general education setting daily (2.5 hours per week) because, unlike Bells Mill, Cabin John does not offer recess. Nov. 15, 2017 Tr. 226:8–229:17.

November 7, 8, 15, and 16, 2017.  *See* ALJ Dec 2.  The ALJ made the following findings of fact

regarding the 2016 IEP:

### January to April 2016 – the first IEP proposed by MCPS

29.  The Student was ten years old and in 4th grade.

30.  The Student took part in group instruction at the Private School. At times, he was

disruptive, with behaviors such as stamping his feet, screaming at the teacher, reaching

over the table for a preferred item, and repeating a demand. At other times he could

participate actively in the group without disruption, especially when given prompting, cueing, and praise from an aide. Frequent reinforcement breaks also helped with his behavior and participation.

31. MCPS drafted an IEP for the Student. MCPS worked in collaboration with the Parents, the Private School and the Parents' recently hired new education consultant, Dr. Solomon.

32. The proposed MCPS IEP was also developed based on the observations of the Student at the Private School by a MCPS Resource Teacher and an MCPS Autism Specialist.

33. An IEP Team meeting was held on April 15, 2016,[12] and included: special education staff from MCPS; a MCPS school psychologist; a MCPS OT; a MCPS SLP; the Student's Parents; their attorney; a special education teacher from the Private School; and Dr. Solomon.

34. The IEP Team agreed that the Student was certificate (not diploma) track and would participate in alternate assessments.

35. The proposed MCPS IEP's present level of performance (PLOP) sections described the Student in all areas of need, including oral language, behavior, safety, adaptive skills, social skills and gross motor.[13] It also discussed his PANS and CVID diagnoses. The information contained within the PLOP sections was taken directly from the Private School documents provided to MCPS by the Parents, including the Private School's IEP, BIP, and Annual Education Report, and the evaluations performed by the Children's

Hospital psychologist and SLP, as complemented by the observations of the MCPS Resource Teacher.

36. The proposed MCPS IEP contained goals across all areas of need, including speech/language, behavior, personal management, social skills, written language, reading, mathematics, and gross motor. Many of the goals addressed similar areas as the Private School IEP.[14] The IEP also contained goals that were added or expanded upon including: reciprocal play interactions with peers, including turn taking; personal management, including gathering and putting away school material and following arrival/departure/lunch routines; and speech intelligibility, for letter sounds and blends.

37. The proposed MCPS IEP contained accommodations, supports and modifications to assist the Student. Relevant accommodations, supports and modifications included: breaking assignments down into smaller units; errorless teaching; reminders for appropriate behavior; frequent and immediate feedback; frequent reminder of rules; multiple and frequent breaks; short instructions in simple language; concrete reinforces; fast-paced instruction; verbal and visual prompting, one-to-one instruction for new skill acquisition; and proximity control. It also provided the Student would be in a highly structured classroom.

38. The proposed MCPS IEP also implemented the BIP developed by the Private School.

39. The proposed MCPS IEP provided for the following instruction to occur outside general education: twenty-two hours, thirty minutes, of special education instruction weekly for all academic and related arts instruction; one hour, thirty minutes weekly for direct

speech services; one hour monthly for direct physical therapy (PT) services; and thirty minutes quarterly for direct OT service.

40. The proposed MCPS IEP provided that the Student would be in the general education setting with special education support for five hours weekly during lunch and recess.

41. At this time, the Student had emerging social skills and was interested in interacting with others.

42. The proposed MCPS IEP offered Extended School Year services to the Student.

43. MCPS offered the Elementary School's Autism Program as the placement for the Student.

44. The Elementary School's Autism Program is a self-contained, outside of general education program, that provides specialized instruction in a highly structured setting with multiple opportunities for facilitated practice, direct modeling of academic and social skills, and teacher facilitation of skills to multiple situations and settings.

45. A classroom in the Elementary School's Autism Program has, on average, six students. It is taught by a Special Education teacher, and has at least two paraeducators in the classroom.

46. Students are supported by at least two paraeducators in the cafeteria.

47. Staffing for the students in the Autism Program is adjusted based on the needs of the students assigned to the classroom as demonstrated by collected data.

48. Applied Behavior Analysis (ABA) is used with the Students in the Autism Program. The data is analyzed daily by the special education teacher and a student's program is modified based on the data.

49. A MCPS Program Specialist visits each Autism Program classroom at least once a week. The Program Specialist also reviews the Student's ABA data and makes modifications to the student's programming.

50. The Elementary School's Autism Program classroom staff is familiar with and implements fast paced instruction and dense reinforcement strategies, such as token economy and social praise.

51. The Elementary School's Autism Program staff is experienced in working with students who elope, tantrum, have self-injurious behaviors, are unpredictable, and have compulsions and rituals.

52. The Elementary School's Autism Program takes the students into the community once a week.

53. The Elementary School's Autism Program also teaches life skills and social skills.

54. At times, non-disabled peers would join the disabled children in the classroom or at recess in a structured program named Best Buddies.

55. The Parents agreed to most elements of the proposed MCPS IEP.

56. The Parents did not enroll the Student at that time. The Parents were concerned with the Student attending lunch and recess in the general education setting and with there not being a full-time Registered Nurse (R.N.) assigned to the school.

**May to August 2016 – the updates to the April 2016 IEP proposed by MCPS**

57. In Spring 2016, MCPS agreed, and advised Dr. Solomon, that if the Student attended the Elementary School, the staffing would be adjusted to meet the needs of the Student.

58. On July 6, 2016, the Parents signed a tuition contract with the Private School for the 2016-2017 school year.

59. Throughout the Spring and Summer of 2016, MCPS, Dr. Solomon, and the Private School staff, continued to work collaboratively together on the proposed IEP. MCPS requested, and the Private School shared, additional information about the Student's behavior and social skills.

60. By August 2016, the Student had made progress on some math and reading objectives. He also had made progress in the following areas: using appropriate voice volume; asking before taking an object; demonstrating eye contact when someone approached/greeted him; demonstrating manners with regard to greetings and responding to simple questions; adhering to the commands of "stop" and "come here," even when engaged in a preferred activity; and using and responding to greetings. He generally continued to need prompting to attend to speakers.

61. The Student was participating in group instruction at the Private School and in shared activities with peers, including taking turns on iPad games and sharing art supplies. He did this with substantial prompting.

62. The Student continued to elope. It mainly occurred when the Student asked for an item, but was told he could not have it.

63. The student was having tantrums more frequently. Tantrums lasted anywhere from a few seconds to fifteen minutes. Triggers were when the Student was denied access to a desired item, activity, ritual, or routine. Approximately once a day, the Student's tantrum would include him hitting his head against a hard object.

64. Strategies being implemented by the Private Schools included: predictable schedules; preparation before transitions; "if/then" prompts; token economy; and prompting for the Student to use word to express his frustration. If preventative strategies were not successful, staff was utilizing: close proximity to ensure safety; additional staff to prevent

injury; modifying the environment to prevent elopement; and use of mats to prevent injury against the tile floor or other hard objects.

65. The PLOP sections of the proposed MCPS IEP were updated in August 2016 based on this new information from the Private School. The majority of the rest of proposed MCPS IEP remained the same as the April version, including the proposed special/general education hours and the proposed placement of the Student in the Autism Program at the Elementary School.

66. The Parents, Dr. Solomon, and MCPS staff attended an IEP Team meeting on August 15, 2016.[15]

67. MCPS employs Certified Nursing Assistants/Certified Medication Technicians as heath room aides. They all have training to take the vital signs of a student in the school. A R.N. is always available by telephone to evaluate the results.

68. No additional medical intervention is required for the Student.

69. The Parents and MCPS staff were in agreement as to most of the contents of the proposed MCPS IEP. However, because MCPS would not provide a full-time R.N. at the school, and because the Student would be in general education for lunch and recess, the Parents did not enroll the Student in MCPS.

ALJ Dec. 10–16 (footnotes omitted).

The ALJ concluded that the 2016 IEP and proposed placement offered A.H. a FAPE. ALJ Dec. 35. She found that the accommodations and supports outlined in the IEP "clearly addressed the Student's identified needs," and that the goals and objectives in the IEP were "challenging and ambitious and, along with his [behavioral intervention plan], established a comprehensive plan for his academic and functional advancement." *Id*. at 29–30. As for MCPS's decision to include A.H.

in the general education setting for lunch and recess, the ALJ concluded that, "given the lack of data regarding the Student's involvement within a cafeteria," MCPS's plan to gather data and then modify the IEP, if necessary, was reasonable. *Id*. at 34. In addition, she held that, "MCPS's plan for the prevention of the Student's elopement and tantrums in [the lunch and playground] settings was similarly appropriate, and was supported by the Student's [present levels of performance] and the proposed IEP." *Id*. at 34–35. She found that the "Parents' assertion that these accommodations and supports would not be implemented in such a way as to ensure the Student's safety is speculative" and was not a basis for her to conclude that A.H. was denied a FAPE. *Id*. at 35.

As for the 2017 IEP, the ALJ made the following findings of fact:

70. In January 2017, the Parents requested MCPS perform an annual/periodic review of the Student's MCPS IEP. The Parents provided MCPS with the most recent Private School IEP, progress reports, and BIP.

71. The January 2017 Private School IEP contained goals for the following areas of need: social skills (increasing attention toward a speaker, using social pleasantries, answering questions posed by a speaker); adaptive behavior (utilizing self-calming strategies, decreasing elopement, dropping, self-injurious behavior, and aggression); adaptive skills (personal hygiene, dressing); life skills (safety in the community, typing, email use); and vocational skills.[16]

72. The Student's BIP was again updated by the Private School in March 2017 and provided to MCPS. The BIP continued to address the behaviors of elopement, tantrums, and self-injurious behavior. Accommodations were included in the BIP, including: increased physical prompting during transitions; work area with reduced visual distractions; intensive one-to-one instructions; small group (one adult-to-two students) instruction; frequent reminders; frequent reinforcement; and advanced preparation for changes in routine.

73. The Private School had discontinued the Student's involvement in the community outings due to his inability to follow safety directions and his body dropping, head banging, and elopement while in the community.

74. At school, the Student followed rules to stay on his feet, maintain a calm voice, stay with teachers, and have a calm body.

75. The Student responded to his name when called by looking toward the speaker.

76. The Student requested preferred items regularly instead of accessing them without permission.

77. The Student was highly motivated to interact with adults and peers.

78. The Student enjoyed swinging on the playground and working on art projects.

79. The Student still had difficulty attending to the instructor during group instruction and would put his head down and speak out of turn frequently.

80. The Student responded well to concrete reinforcers, such as token economy.

81. After receiving all of this information, MCPS developed a proposed IEP for the Student.[17]

82. The proposed MCPS IEP described the Student and his PLOP for all areas of need, including oral language, written language, reading, math, recreation/leisure activities, social skills, adaptive behavior, independent/daily living skills, community, and gross and fine motor. The information contained within the PLOP sections was taken directly from the Private School's most recent IEP and BIP.

83. The proposed MCPS IEP contained goals across all areas of need, including: adaptive behavior (calming activities, decreasing elopement, aggression, dropping, self-injury); adaptive skills (hygiene, vocational tasks); community (following safety directions); speech/language (answering questions and using pleasantries); social skills (attention to lead instructor); occupational therapy (arrival and departure routines, feeding, and dressing); leisure activities (appropriate use of free time); and physical therapy (posture).[18]

84. The proposed MCPS IEP included implementation of the most recent BIP developed by the Private School.

85. The proposed MCPS IEP contained accommodations, supports and modifications for assisting the Student in accessing the curriculum and being available to learn. The accommodations and supports included: visual cues; multiple and frequent breaks; frequent and immediate feedback; repetition of directions; concrete reinforcement; short

instruction; errorless teaching strategies; frequent reminder of rules; preferential seating; alternate seating options; and encouragement and reinforcement of appropriate behavior.

86. The proposed MCPS IEP provided for a highly structured classroom with reduced distractions to help the Student maintain focus on assigned tasks. It also included that there should be a low staff-to-student ratio; adult support; frequent eye contact/proximity control; physical delineations of boundaries across all settings; close adult proximity at all times; and adult support throughout the day.

87. Each goal of the proposed MCPS IEP reiterated the Student was to have close adult proximity, differential reinforcement, and concrete reinforcers.

88. The proposed MCPS IEP provided for the following hours outside of general education: twenty-two hours, fifty minutes, of special education weekly for all academic and related arts instruction; one hour weekly for direct services by a speech therapist; thirty minutes quarterly for direct services provided by an OT; one hour monthly for direct services provided by a physical therapist.

89. The proposed MCPS IEP provided for five hours weekly in general education for lunch and recess.

90. MCPS determined there was no data that suggested the Student could not be included in general education, with special education support, during lunch and recess.

91. Had the Student enrolled in MCPS, the Student's IEP would have been revised for his transition to middle school. The revised IEP would have provided for thirty minutes in general education for lunch. There is no recess in the general education setting at the Middle School.

92. The proposed MCPS IEP offered Extended School Year services to the Student.

93. The placement proposed by MCPS continued to be in the Autism Program at the Elementary School. The Student's placement for the next school year would have been the Autism Program within the Middle School.

94. The Middle School Autism Program is similar to the Elementary School version. It usually has seven students in a classroom, and is taught by a Special Education teacher and three paraeducators. It includes more of a focus on the mastery of activities of daily living and social skills, and includes community outings twice weekly.

95. At least three paraeducators support the students during lunch in the cafeteria.

96. Staffing for the Autism Program, and for the students in the classroom, is adjusted based on the needs of the students assigned to the classroom as demonstrated by collected data.

97. ABA is used with the students in the Autism Program. The data is analyzed daily by the special education teacher and a student's program is modified based on the data.

98. A MCPS Program Specialist visits each Autism program classroom at least once a week. The Program Specialist also reviews the students' ABA data and makes modifications to the students' programming.

99. The Middle School's Autism Program classroom staff is familiar with implementing fast paced instruction and dense reinforcement strategies, such as token economy and social praise.

100. The Middle School's Autism Program staff is experienced in working with students who elope, tantrum, have self-injurious behaviors, are unpredictable, and have compulsions and rituals.

101. The IEP Team met to review the proposed MCPS IEP on April 4, 2017.[19] The meeting included: MCPS general and special education teachers; MCPS occupational therapist

and speech-language pathologist; MCPS assigned R.N.; the Student's Parents and their attorney; the Private School's Autism Division Director; and the Private School's Autism Head Teacher.

102. The Parents agreed to most elements of the proposed IEP.

103. The Parents rejected the proposed IEP. They did not agree with the inclusion of the Student in general education during lunch/recess. The Parents wanted an R.N. to be present at the school.

ALJ Dec. 16–21 (footnotes omitted).

The ALJ concluded that the 2017 IEP also offered A.H. a FAPE. ALJ Dec. 38. She found that the "goals, objectives, accommodations, and supports contained within this 2017 IEP were once again clearly tailored to the Student's unique needs." *Id*. at 36. She also held that the Autism Programs at Bells Mill and Cabin John were appropriate placements to implement the 2017 IEP. *Id*. at 37. As for the Parents' concerns regarding A.H.'s safety in the general education setting at the proposed placements, she concluded that the "IEP ensured the Student was properly supported through a low staff-to-student ratio, adult support, frequent eye contact/proximity control, and close adult proximity at all times." *Id*. at 39. She also noted that the staff in both of the Autism Programs are "experienced in working with students who elope, tantrum, have self-injurious behaviors, are unpredictable, and have compulsions and rituals." *Id*. at 38. In addition, the ALJ pointed out that including A.H. in the general education setting for lunch and recess would provide him with opportunities to address some of the social skills and adaptive behavior goals outlined in the IEP. *Id*. at 39.

The ALJ addressed the Parents' remaining challenges to the proposed placements at the end of her opinion. With respect to the Parents' concerns about the level of staffing at Bells Mill

and Cabin John, the ALJ concluded that the 2016 and 2017 IEPs provided for appropriate support of A.H. and noted that the placements "would be required to staff the classroom to provide the supports outlined in the IEP." ALJ Dec. 41.

The ALJ also rejected the Parents' challenges to the adequacy of Applied Behavior Analysis ("ABA") at the proposed placements. *Id.* First, the ALJ found that the Parents failed to demonstrate that A.H. would be denied a FAPE if he was not provided with one-to-one ABA instruction. *Id.* She reasoned that both IEPs require intensive, individualized instruction and that the proposed placements would be required to provide instruction to A.H. at the level that is necessary to him to achieve the goals and objectives outlined in his IEPs. *Id.* at 41-42 As for the Parents' assertion that the staff at the proposed placements do not adequately collect behavioral data, the ALJ found that Ms. Stanley's testimony about the staff's practice of collecting data discreetly sufficiently explained why Dr. Solomon did not observe behavioral data being collected during her observations. *Id.* at 42. Finally, the ALJ concluded that the absence of a Board Certified Behavioral Analyst ("BCBA") on staff at the proposed placements to analyze student data did not deny A.H. a FAPE because, as Ms. Stanley testified, the special educators on staff are trained and experienced in evaluating and assessing data. *Id.*

Dissatisfied, Plaintiffs filed suit in this Court, and the parties filed the pending summary judgment motions.

### Standard of Review

In reviewing cross-motions for summary judgment in an IDEA action, the "'reviewing court is obliged to conduct a modified *de novo* review'" of the administrative record, "'giving "due weight" to the underlying administrative proceedings.'" *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *6 (D. Md. Dec. 29, 2014) (quoting *M.M. ex rel. D.M. v. Sch. Dist. of Greenville*

*Cty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982)). This means that when an ALJ makes findings of fact "in a regular manner and with evidentiary support," those findings "are entitled to be considered *prima facie* correct," and "the district court, if it is not going to follow them, is required to explain why it does not." *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991); *see N.P. v. Maxwell*, 711 F. App'x 713, 718 (4th Cir. 2017); *M.C.*, 2014 WL 7404576, at *6–7. The Court then reaches its decision based on the preponderance of the evidence. *Rowley*, 458 U.S. at 205. Yet, the Court cannot "substitute [its] own notions of sound educational policy for those of local school authorities." *M.C.*, 2014 WL 7404576, at *6–7 (quoting *M.M.*, 303 F.3d at 530–31 (quoting *Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997))). The burden of proof is on Plaintiffs as the party seeking relief. *See Barnett v. Fairfax Co. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied*, 502 U.S. 859 (1991).

"This standard works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases . . . ." *M.C.*, 2014 WL 7404576, at *7. Thus, summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). When considering

cross-motions for summary judgment, "the court must view each motion in a light most favorable to the non-movant." *Linzer v. Sebelius*, No. AW-07-597, 2009 WL 2778269, at *4 (D. Md. Aug. 28, 2009); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## Discussion

### *Credibility of Witnesses and their Testimony*

Plaintiffs contend that the ALJ made "literally no credibility determinations about any witnesses throughout her Decision" and instead "ignores the testimony from the Parents' witnesses, usually without any attempt to state a reason, and fails to acknowledge the vast difference in knowledge of A.H. between Parent and school system witnesses." Pls.' Mem. 20. In Plaintiffs' view, this means that the ALJ's findings of fact, which rely on the testimony of MCPS's witnesses over that of the Parents' witnesses, are not owed any deference. *Id.* at 12.

The issue is whether the ALJ's credibility determinations are "regularly made," because if they are, then they, as well as the educators' opinions, are due deference. *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *11 (D. Md. Dec. 29, 2014) (noting that, in *S.A. v. Weast*, 898 F. Supp. 2d 869, 874 (D. Md. 2012), this Court stated that it "owes deference to the ALJ's determinations of the credibility of witnesses[,] and . . . owes generous deference to educators" when it reviews IDEA cases). An ALJ's findings are "regularly made" when "they are reached through a process that is [within] the accepted norm of a fact-finding process." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008). Thus, the findings are regularly made if the ALJ "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *Id.* Indeed, the Fourth Circuit has held

that a reviewing court cannot "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility." *Doyle v. Arlington Cty. Sch. Bd.,* 953 F.2d 100, 104 (4th Cir. 1991) (quoting *McCrary v. Runyon*, 515 F.2d 1082, 1086 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976); concluding that the reason given by the reviewing officer for the State Board of Education "for discrediting a witness who[m] he had not seen or heard testify, in the face of the crediting of that same witness by a hearing officer who had seen and heard the witness testify, [wa]s so far from the accepted norm of a fact-finding process designed to discover truth that . . . the due weight which should be accorded the decision of the reviewing fact-finding officer depending on that credibility decision [wa]s none").

Moreover, while the district court must "'explain its reasons for rejecting the findings of the hearing officer,'" the "IDEA hearing officer is not required to offer a detailed explanation of his or her credibility assessments." *S.A.*, 898 F. Supp. 2d at 877 (quoting *Cty. Sch. Bd. of Henrico Cty., Va. v. Z.P.*, 399 F.3d 298, 306 (4th Cir. 2005)). Thus, "a court should give deference even to a poorly explained administrative decision as long as the hearing officer used standard fact-finding methods." *S.T. ex rel. S.J.P.T. v. Howard Cty. Pub. Sch. Sys.*, No. JFM-14-00701, 2015 WL 72233, at *2 (D. Md. Jan. 5, 2015), *aff'd sub nom. S.T. v. Howard Cty. Pub. Sch. Sys.*, 627 F. App'x 255 (4th Cir. 2016). For example,

> [i]n *J.P.*, the Fourth Circuit held that the hearing officer's decision warranted deference even though the opinion did not explain what evidence the hearing officer found most important or why the officer was more persuaded by the school board's evidence. In fact, the court held that the decision was sufficiently detailed despite the fact that only two findings addressed issues in dispute, and these findings were as "about as bare-boned as they could be."

*S.A.*, 898 F. Supp. 2d at 876 (quoting *J.P.*, 516 F.3d at 262). Additionally, "the Fourth Circuit has consistently held that an ALJ's implicit credibility determinations are entitled to the same

deference as explicit findings." *Id.* at 877–78 (*citing* *Z.P.*, 399 F.3d at 307; *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327–28 (4th Cir. 2004)).

The educators' opinions, also, are entitled to deference. *M.C.*, 2014 WL 7404576, at *11; *S.A.*, 898 F. Supp. 2d at 874 (noting that this Court "owes generous deference to educators" when it reviews IDEA cases). Indeed, the school district's "notions of sound educational policy" are entitled to considerable deference. *See M.M.*, 303 F.3d at 530–31; *Hartmann*, 118 F.3d at 999; *M.C.*, 2014 WL 7404576, at *6–7; *S.A.*, 898 F. Supp. 2d at 874. "[I]t is a longstanding policy in IDEA cases to 'afford great deference to the judgment of education professionals.'" *N.P. v. Maxwell*, 711 F. App'x 713, 717 (4th Cir. 2017) (quoting *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014)).

> At the same time, deference is based on the application of expertise and the exercise of judgment by school authorities. The Act vests these officials with responsibility for decisions of critical importance to the life of a disabled child. The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue. See §§ 1414, 1415; [*Rowley*, 458 U.S.] at 208–209, 102 S.Ct. 3034. By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

*Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001–02 (2017).

At the administrative hearing in this case, the Parents presented the testimony of three witnesses: A.H.'s mother, E.H.; Dr. Solomon, the Parents' educational consultant who was admitted as an expert in special education; and Katie Quinn, an Autism specialist at Ivymount who was admitted as an expert in ABA. MCPS also introduced the testimony of three witnesses: Tina Garland, a program specialist in the Autism Division of MCPS who was admitted as an expert in special education with an emphasis on teaching children with Autism; Emily Stanley, an

instructional specialist in the Autism Division of MCPS who was admitted as an expert in special education and behavior analysis; and Melinda McCartin, a registered nurse for MCPS who was admitted as an expert in nursing.

The ALJ recognized the testimony of both the Parents' witnesses and MCPS's witnesses in her decision and implicitly determined that the testimony of MCPS's witnesses was more credible than that of the Parents' witnesses. This decision was "regularly made." *M.C.*, 2014 WL 7404576, at *11. Ms. Garland and Ms. Stanley, both of whom Dr. Solomon agreed are highly qualified providers in the education of children with autism, gave "cogent and responsive explanation[s]" for their views on the appropriateness of the IEPs and proposed placements, entitling their opinions to deference. *See Endrew F.*, 137 S. Ct. at 1002; Nov. 7, 2017 Tr. 186:1–18. First, with respect to Ms. Garland, she explained that she participated in the development of A.H.'s 2016 IEP as a program specialist for the MCPS Autism Division. Nov. 15, 2017 Tr. 21:18–32:9. During that process, Ms. Garland stated that she conducted an observation of A.H. at Ivymount and conferred with A.H.'s family, Dr. Solomon, and Ivymount staff. *Id.* 31:4–9, 92:3–95:3. Ms. Garland also explained her familiarity with the Autism Program at Bells Mill and testified that, "when [she] observed [A.H.], when [she] saw how well he responded to fast-paced instruction, to the dense reinforcement schedule to differentiation, [she] thought that he would do very well in [the] Bells Mill program since those are the strategies that we also use." *Id.* 49:14–54:2. She further testified that the staff in the Autism Program at Bells Mill have experience working with students who elope and run, and she described strategies that the staff could use to support A.H. in the general education setting, including: fading A.H. into the cafeteria and playground; placing A.H. at a table far from the cafeteria doors; and instituting concrete reinforcements to encourage his appropriate behavior. *Id.* 60:4–62:10, 101:5–11. Ms. Garland

testified that including A.H. in the general education setting for lunch and recess was appropriate, at least initially, because he enjoys interacting with others and this setting would allow him "to model appropriate behavior and to work on generalizing the social skills that he is being taught discreetly in the classroom." *Id*. 63:2–64:2, 97:6–19. Additionally, she expressed no doubt that, having reviewed the 2016 IEP, Bells Mill had the resources to implement it. *Id*. 81:25–82:14.

Ms. Stanley also provided a "cogent and responsive explanation" for her view that the IEPs and proposed placements were appropriate for A.H., such that her opinion was similarly due deference. *See Endrew F.*, 137 S. Ct. at 1002. Ms. Stanley explained that she participated in both the August 2016 and April 2017 IEP meetings as an instructional specialist from the MCPS Autism Division. Nov. 15, 2017 Tr. 161:17–180:17. During that time, she stated that she reviewed A.H.'s records, spoke with Ivymount staff, and conducted an observation of A.H. at Ivymount. *Id*. Ms. Stanley testified that A.H. did not require non-public placement because, "his behavioral needs do not – from the data and from the present levels and the reports, exceed the supports and the program that we have at either Cabin John or Bells Mill." *Id*. 215:2–216:12. As for A.H.'s safety in the general education setting, Ms. Stanley explained that the students are accompanied by "at least three staff" during lunch and that the staff have experience working with children who have tantrums and elope. *Id*. 185:17–193:15, 210:15–211:10. She further testified that including A.H. in the general education setting for lunch was appropriate because "he does enjoy interacting with others," and it would give him an opportunity to develop and practice socially significant skills. *Id*. 187:5–188:7. Finally, she testified that, in her expert opinion, the 2017 IEP was designed to provide A.H. an educational benefit and that the Autism Program at Cabin John was an appropriate placement. *Id*. 215:2–216:12.

Given the detailed, "cogent and responsive explanation[s]" provided by Ms. Garland and Ms. Stanley for their views on the appropriateness of A.H.'s inclusion in the general education setting and the ability of the proposed placements to effectively implement the IEPs, the ALJ did not err in reaching her credibility determinations. *See Endrew F.*, 137 S. Ct. at 1002. Rather, the ALJ's analysis follows a normal fact-finding process; she has not "abdicat[ed] [her] responsibility to decide the case." *See J.P.*, 516 F.3d at 259. Accordingly, I will defer to the ALJ's conclusion that Defendants' experts' testimony was credible. *See Endrew F.*, 137 S. Ct. at 1002; *M.C.*, 2014 WL 7404576, at *11.

*Weight Due to Findings of Fact*

I also must determine the weight to give the ALJ's findings of fact. *See Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). According to Plaintiffs, the ALJ's findings of fact were not "regularly made" and are not entitled to deference because she "consistently chose to ignore conflicting evidence when making her factual findings, rather than recognize it, weigh it, and then reconcile it." Pls.' Mem. 15. They further assert that "her factual findings are full of errors" and, as a result of these errors, "the ALJ ends up describing a child much less disabled than A.H." *Id.* at 15. Plaintiffs also claim that the ALJ improperly relied on evidence outside of the IEPs in reaching her Decision. *Id.* at 23.

The ALJ in this case conducted a proper hearing, the determinations from which are entitled to deference. Six witnesses testified, three of whom were called by Plaintiffs, and over one hundred exhibits were admitted. The ALJ's lengthy decision demonstrates a thorough review of the exhibits and testimony. The ALJ extensively described A.H.'s disabilities, needs, and performance at Ivymount throughout her opinion. *See* ALJ Dec. at 7–21, 30, 35, 39. In addition, the ALJ outlined the proposed IEPs for A.H., including the areas of need, goals and

accommodations, and described the proposed placements. *Id.* Significantly, Plaintiffs concede that they agreed with most elements of the IEPs. *See* Nov. 8, 2017 Tr. 143:6–144:1, 173:9–175:20 (E.H.'s testimony that "I agree with everything on the IEP except for … [t]he gen ed piece.").

Plaintiffs' argument that the ALJ improperly relied on evidence outside of the IEPs in reaching her decision is unavailing. It is true that, "[i]n evaluating whether a school district offered a FAPE, a court generally must limit its consideration to the terms of the IEP itself." *A.K. ex rel. J.K. v. Alexandria City School Bd.*, 484 F.3d 672, 682 (4th Cir. 2007). However, this Court's review of the ALJ's decision reveals that she relied only on the terms of the IEPs themselves and testimony that explained how the IEPs would be implemented at the proposed placements. Consideration of this testimony was not improper. *See R.E. v. N.Y. City Dep't of Educ.,* 694 F.3d 167, 186 (2d Cir. 2012) ("While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP."); *S.B. v. N.Y. City Dep't of Educ.*, 117 F. Supp. 3d 355, 363 (S.D.N.Y. 2015) ("It seems clear, however, that in order to determine if a proposed placement will be unable to comply with a student's IEP, evidence regarding the proposed placement must be considered . . . .").

It appears that Plaintiffs' contention that the ALJ ignored evidence and, consequently, reached conclusions contrary to the evidence, stems from the ALJ's decision to give limited weight to the testimony of Plaintiffs' witnesses. As discussed, I agree with the ALJ's implicit weight and credibility determinations regarding the witnesses' testimony. Thus, the ALJ's findings of fact were regularly made and entitled to deference. *See J.P.*, 516 F.3d at 259. And, insofar as Plaintiffs argue that minor inaccuracies provide a basis for concluding that the ALJ's findings of fact were not regularly made, I disagree, and in any event, I have reviewed the record *de novo* and found that "the majority of facts relied upon by the ALJ were supported by the record through

corroborating documents . . . and witness testimony." *See Avijan v. Weast*, 242 F. App'x 77, 80 (4th Cir. 2007) (holding that "the district court did not err in accepting the factual findings of the ALJ [where] the majority of facts relied upon by the ALJ were supported by the record through corroborating documents, letters, and witness testimony."); *Snyder v. Montgomery County*, No. DKC-08-1757, 2009 WL 3246579, at * 17 (D. Md. Sept. 29, 2009) (noting that a "minor factual error" in the ALJ's lengthy written opinion does not "provide a basis for a finding that the findings of fact were not regularly made").

*FAPE*

To obtain court-ordered reimbursement for A.H.'s private education, Plaintiffs first must demonstrate that "the public school system failed to provide a free appropriate public education." *Carter ex rel. Carter v. Florence Cty. Sch. Dist. Four*, 950 F.2d 156, 161 (4th Cir. 1991) (stating that, if plaintiffs establish the first element, the second element to prove is that "the private school chosen by the parents did provide an appropriate education to the child"). In this regard, Plaintiffs argue that A.H.'s IEPs fell short because they included lunch and recess in the general education setting and A.H. cannot benefit from this setting. Pls.' Mem. 34. In addition, Plaintiffs assert that the proposed placements were inadequate for four reasons: (1) A.H. would not have been safe in the proposed placements; (2) they did not provide sufficient ABA programming; (3) they did not offer adequate staffing and instructional methods; and (4) A.H. would have been the only student in electives at Cabin John. *Id.* at 28–43. The Court will address each of these arguments in turn.

Plaintiffs first argue that the 2016 and 2017 IEPs inappropriately provided A.H. would spend lunch and recess in the general education setting, for a total of 5 hours per week. In support of this argument, Dr. Solomon testified that A.H. would not benefit from inclusion in the general education setting because "he is barely available for guided and structured social interactions" and

does not have the skills to imitate his non-disabled peers. Nov. 7, 2017 Tr. 108:1–110:3. Similarly, Ms. Quinn testified that, based on her experience with A.H. at Ivymount, exposing him to a less-structured setting would not be beneficial. Nov. 8, 2017 Tr. 225:12–226:6. Ms. Quinn admitted, however, that she was not qualified to opine as to whether A.H. would benefit from inclusion in the general education setting because she only has observed him at Ivymount, which has a 100% disabled population. *Id.*

Because A.H. has never been included in the general education setting, MCPS concluded that there was no data to support A.H.'s removal from the general education setting for lunch and recess. 2016 IEP 61, 2017 IEP 74. However, MCPS explained that data would be collected upon his enrollment and then they would determine whether A.H.'s continued inclusion in this setting was appropriate. *Id.* This plan was reasonable, and the evidence demonstrates that A.H.'s initial inclusion in the general education setting for lunch and recess was appropriate. That is, Ivymount reported that A.H. was "highly motivated to interact with adults and peers," and, indeed, that "when [A.H.] earns reinforcement, he most often chooses to interact with adults or peers." Ivymount Nov. 18, 2016 Report 11, Pls.' Ex. 33; *see also* Ivymount Dec. 16, 2015 Report 2, Pls.' Ex. 11 ("[A.H.] is highly motivated to interact with familiar adults[.]"); Dec. 9, 2016 Report 1, Pls.' Ex. 31 ("[A.H.] seems to enjoy conversations with peers and adults[.]"). Similarly, MCPS physical therapist Jane Juliano reported that, during her two-hour observation of A.H., he was "engaged with staff members, greeted them." *See* 2016 IEP 69. In addition, Ms. Garland and Ms. Stanley testified that A.H. would benefit from inclusion in the general education setting for lunch and recess because it would give him an opportunity to model appropriate behavior and continue developing his social skills. Nov. 15, 2017 Tr. 63:2–64:2, 188:25–189:19. Taken together, this evidence demonstrates that the ALJ properly deferred to MCPS's determination that A.H.'s

inclusion in the general education for lunch and recess, with special education support, was appropriate. *See N.P.*, 711 F. App'x at 717; *E.L.*, 773 F.3d at 517; *M.M.*, 303 F.3d at 530–31; *Hartmann*, 118 F.3d at 999; *M.C.*, 2014 WL 7404576, at *6–7.

Plaintiffs next assert that A.H. would not have been safe during lunch, recess, and community outings at the proposed placements. *See* Pls.' Mem. 28. Plaintiffs do not challenge the adequacy of the IEPs for failing to provide appropriate support, but claim that the proposed placements could not maintain A.H.'s safety because his maladaptive behaviors are unpredictable and the level of staffing at the proposed placements is inadequate. Pls.' Mem. 30; *see also* Nov. 8, 2017 Tr. 143:6–144:1, 173:9–175:20 (E.H.'s testimony that "I agree with everything on the IEP except for … [t]he gen ed piece. Implementing the IEP with [A.H.], I disagree that those two placements could handle him."). Plaintiffs specifically expressed concerns about A.H.'s safety during lunch at the proposed placements because there are doors in the cafeterias that allow access to the outside and, if the supervising paraeducators were not paying attention, A.H. would have ample opportunity to elope to the outside. Nov. 8, 2017 Tr. 51:4–61:2.

Both IEPs provide extensive supports and services for A.H. across the school day. Among others, the 2016 IEP requires "frequent eye contact/proximity control" and "special education support during lunch and recess," and the 2017 IEP mandates "close adult proximity at all times" and "adult support." 2016 IEP 29, 50; 2017 IEP 67, 71. Plaintiffs express concerns about A.H.'s safety at the proposed placements because of the "intensity and unpredictability of A.H.'s behavior," but they have not demonstrated that the proposed placements lacked the capacity to implement the extensive supports outlined in the IEPs. Pls.' Mem. 29. To the contrary, both Ms. Garland and Ms. Stanley testified that the proposed placements had the resources to implement A.H.'s IEPs. Nov. 15, 2017 Tr. 82:6–17, 215:3–216:12. They explained that two paraeducators

accompany the students during lunch and recess at Bells Mill and "at least three staff" accompany the students during lunch at Cabin John, resulting in a ratio of approximately two students to one staff member.  Nov. 15, 2017 Tr. 101:5–11, 186:5–8; *see also id.* 47:22–48:22 (Ms. Garland's testimony that "there were 6 students" in the proposed classroom at Bells Mill); 174:17–23 (Ms. Stanley's testimony that "the classrooms [at Cabin John] each have 7 students").  Significantly, Ivymount reported that this level of staffing was appropriate for A.H. during non-work times. Ivymount Dec. 16, 2015 Report 4 (stating that A.H. "requires a high staff-to-student ratio (e.g., two students to one staff member) to stay safe during non-work times, such as lunch and recess"). In addition, Ms. Garland and Ms. Stanley testified that the staff at Bells Mill and Cabin John have experience working with students who have tantrums and elope and have strategies to support students with these behaviors.  Nov. 15, 2017 Tr. 60:4–62:10, 185:17–193:15.

Plaintiffs' safety concerns were further negated by MCPS's plan to collect data and assess the appropriateness of A.H.'s continued inclusion in the general education setting once enrolled. *See* 2016 IEP 61; 2017 IEP 57, 74.  Ms. Garland and Ms. Stanley also explained that if a student is unable to safely participate in the community outings at Bells Mill or Cabin John, the student stays back at school with a paraeducator.  Nov. 15, 2017 Tr.  65:1–22, 193:16–194:6.  This plan is reasonable and, indeed, identical to the practice at Ivymount; when Ivymount put bringing A.H. into the community on hold due to behavioral concerns, A.H. stayed back at school with an aide while other students participated in the community outings.  2017 IEP 14; *see also* Nov. 8, 2017 Tr. 221:25–222:12.  But, despite MCPS's plan to evaluate the appropriateness of A.H.'s inclusion in these settings, and the evidence demonstrating the capacity of the proposed placements to implement the IEPs, Plaintiffs nonetheless claim that A.H. would not have been safe at the proposed placements.   This assertion, based on mere speculation, does not support a finding that

A.H. was denied a FAPE. *R.E.,* 694 F.3d at 195 ("Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement.").

Plaintiffs also assert that the proposed placements are inadequate for A.H. because they do not provide intensive ABA programming. Pls.' Mem. 37–40. Specifically, relying on Dr. Solomon's observations of the proposed placements, Plaintiffs argue that the ABA programming at the placements is inadequate because the ratio of students to staff members is two-to-one, ABA instruction is only delivered for two or three hours of the day, and because the schools do not collect behavioral data or have BCBAs on staff to analyze student data. *Id.*; Nov. 7, 2017 Tr. 87:8– 89:5, 181:11–183:4. Plaintiffs point out that, at Ivymount, by contrast, ABA instruction is delivered throughout the day in a one-to-one format, data is collected several times a minute, and data is analyzed by BCBAs. Pls.' Mem. 38.

The 2016 and 2017 IEPs implicitly require ABA instruction by setting behavioral and academic goals and mandating, among other supports and services, "errorless teaching strategies," "frequent and/or immediate feedback," and positive reinforcement of appropriate behaviors. 2016 IEP 24-25, 31; 2017 IEP 27, 29, 31; *see also* Nov. 7, 2017 Tr. 83:2–23 (Dr. Solomon's testimony that "a large part of the [ABA] approach is through errorless teaching"). However, the IEPs do not mandate full-time, one-to-one ABA instruction, data collection at frequent intervals, or data analysis by a BCBA. Thus, the proposed placements were not required to offer these services in order to provide A.H. with a FAPE. Moreover, for the reasons set forth below, Plaintiffs have not demonstrated that the IEPs were inadequate for failing to mandate these supports and services.

First, Plaintiffs have not demonstrated that the IEPs denied A.H. a FAPE by failing to require one-to-one ABA instruction. The 2016 IEP provides "1:1 instruction for new skill acquisition," a "highly structured classroom," "direct instruction," and a variety of other

instructional supports, including "short instructions," breaking down assignments into smaller units, and "strategies to initiate and sustain attention." *See* 2016 IEP 24–33. Similarly, the 2017 IEP calls for "individualized instruction," a "low staff to student ratio," "close adult proximity at all times," "adult support," and many of the same instructional supports outlined in the 2016 IEP. *See* 2017 IEP 27–34, 56. A.H.'s performance at Ivymount supports the appropriateness of the IEPs. That is, although Ivymount reported that A.H. was "not able to learn new skills without the one-to-one attention of an adult," Ivymount also reported that A.H. participated in daily group instruction for 1.5 to 2.5 hours, albeit with "substantial prompting from staff." Ivymount Dec. 16, 2015 Report at 2, 4; Aug. 4, 2016 IEP 14; *see also* Nov. 8, 2017 Tr. 235:16–24 (Ms. Quinn's testimony that A.H. is "in group instruction varying from an hour and a half to two and a half hours a day). In addition, and significantly, Ivymount's updated IEP for A.H. did not mandate one-to-one support for A.H., but only called for "Intensive staffing (1:1, 2:1, small group)." Ivymount Jan. 24, 2017 IEP 3, Defs.' Ex. 50. Thus, in light of A.H.'s participation in group instruction at Ivymount and the extensive supports and services outlined in MCPS's IEPs, the Court concludes that the IEPs were reasonably calculated to provide A.H. an educational benefit. *See Endrew F.*, 137 S. Ct. at 999.

Plaintiffs also have not demonstrated that the IEPs were inadequate for failing to mandate data collection at frequent intervals or data analysis by a BCBA. The 2017 IEP explicitly requires "task analysis," and both IEPs incorporate Ivymount's BIPs for A.H., which provide "data will be analyzed and compared to baseline rates to determine the treatment effectiveness." *See* Ivymount Dec. 9, 2016 BIP 3, Ivymount Dec. 16, 2015 BIP 3, Pls.' Exs. 13, 32; 2016 IEP 30; 2017 IEP 29, 60. Plaintiffs have not shown that the IEPs were inadequate for A.H., but only that, at Ivymount, data is collected "at least once or twice a minute" and analyzed by a BCBA. Nov. 8, 2017 Tr.

194:23–196:19.  This does not support a finding that A.H. was denied a FAPE.  *See Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 488 (D. Md. 2002) ("[T]he insistence of parents that a non-public school setting is more appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting.").  Moreover, Ms. Garland and Ms. Stanley testified that the staff at Bells Mill and Cabin John consistently collect and analyze both behavioral and instructional data.  Nov. 15, 2017 Tr. 65:23–69:12, 196:6–218:21.  They also testified that a special educator with the proper training and experience, like those at the proposed placements, can analyze data just as well as a BCBA.  *Id*. 115:23–116:17, 147:9–149:5.

Further, Plaintiffs have not shown that the proposed placements lacked the capacity to implement the instructional supports in A.H.'s IEPs related to ABA programming.  Plaintiffs' challenge to the adequacy of ABA programming at the proposed placements is based on Dr. Solomon's visits to the schools, during which she did not see the staff collect behavioral data or deliver individualized ABA instruction throughout the school day.  Nov. 7, 2017 Tr. 87:8–89:5, 181:11–183:4.  However, Dr. Solomon's visits did not include observations of how the classrooms would function with A.H. as a student, and there is no indication that any of the students in the classrooms at the time required instructional supports similar to those outlined in A.H.'s IEPs, such as "1:1 instruction for new skill acquisition" and "high frequency reinforcement."  Thus, Dr. Solomon's observations do not establish that the proposed placements were incapable of implementing the supports and services in A.H.'s IEPs once he enrolled.  To the contrary, Ms. Garland and Ms. Stanley expressed no doubt that the Autism Programs at Bells Mill and Cabin John had the resources to implement the services and supports mandated by A.H.'s IEPs.  Nov. 15, 2017 Tr. 49:1–9, 216:2–12.  They testified that the staff at Bells Mill and Cabin John are trained in ABA, deliver ABA instruction throughout the day, and consistently collect and analyze both

behavioral and instructional data.  Nov. 15, 2017 Tr. 65:23–69:12, 196:6–218:21.  Thus, the Court rejects Plaintiffs' argument that A.H. was denied a FAPE because the proposed placements do not offer adequate ABA programming.

Plaintiffs also challenge the adequacy of the staffing and instructional methods at the proposed placements.  Pls.' Mem. 32.  Plaintiffs do not argue that the instructional supports outlined in the IEPs are inappropriate, but assert that the proposed placements do not offer the staffing and instructional methods necessary for A.H. to make academic and functional progress. *Id*.  This challenge is based on their observations of classrooms at the proposed placements, during which they saw "students engaging in independent work, with the adults close by but not actively engaging with the students, as well as group instruction, where no concrete reinforcement was observed." *Id*. 32–33.  Plaintiffs assert that A.H. requires more intensive instruction and point out that, at Ivymount, A.H. spends most of his day one-on-one with an instructor.  *Id*.

Like their challenge to the adequacy of ABA programming at the proposed placements, Plaintiffs' challenge to the staffing and instructional methods at the placements is based on their observations of how classrooms functioned during their visits – without A.H.'s enrollment or the school's opportunity to comply with his IEPs.  Plaintiffs have not demonstrated that the proposed placements lack the capacity to implement the IEPs if A.H. enrolled.  To the contrary, Ms. Garland and Ms. Stanley testified that the proposed placements had the staffing and expertise to implement A.H.'s IEPs and that A.H. would receive an educational benefit at the placements.  Nov. 15, 2017 Tr. 82:6–17, 215:3–216:12.  Therefore, the Court rejects Plaintiffs' argument that A.H. was denied a FAPE because the proposed placements do not have adequate staffing and instructional methods.

Finally, Plaintiffs assert that A.H. was denied a FAPE because Cabin John was incapable of properly providing "academic instruction in the special education setting outside of general

education" as required by the 2017 IEP. Pls.' Mem. 40–43; 2017 IEP 54. In support of this argument, Plaintiffs point out that students in the Autism Program at Cabin John spend five hours a week in electives, such as art and computer class, but Cabin John does not formally offer electives in the special education setting. Nov. 15, 2017 Tr. 190:5–191:3. Therefore, students in the Autism Program typically attend their electives in the general education setting "with support." *Id.* 244:8–21. If a student is unable to attend electives in the general education setting, Ms. Stanley explained, then they "work on the same content within the [self-contained] classroom with the special educator." *Id.* 190:5–191:3, 244:8–21. Plaintiffs assert that A.H. would have been the only student in these self-contained electives and that such "classes of one" are inconsistent with the social objectives outlined in his 2017 IEP. Pls.' Mem. 41–42. Therefore, according to Plaintiffs, Cabin John is incapable of implementing A.H.'s 2017 IEP. *Id.*

Plaintiffs have not demonstrated that the Autism Program at Cabin John deviates "materially" from the 2017 IEP. *Sumter Cty. School Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011) ("[T]he failure to perfectly execute an IEP does not necessarily amount to the denial of a free, appropriate public education. However, as other courts have recognized, the failure to implement a material or significant portion of the IEP can amount to a denial of FAPE."). By offering the electives in a self-contained classroom with a special educator, Cabin John would comply with the mandate of the 2017 IEP that A.H. receive all "academic instruction in the special education setting outside of general education." 2017 IEP 54. Plaintiffs' assertion that A.H. would have been the only student in self-contained electives at Cabin John is speculative; indeed, Ms. Stanley testified that there was one student last year who attended the self-contained electives. Nov. 15, 2017 Tr. 244:8–21. Moreover, even if A.H. were the only student in self-contained electives, he would still have had opportunities throughout the school day to advance the social

objectives in the 2017 IEP, such as during lunch and community outings.  Therefore, Cabin John's failure to formally offer electives in the special education setting does not constitute a "material" deviation from A.H.'s 2017 IEP.  *Cf. Sumter Cty.*, 642 F.3d at 486 (finding that the school district failed to implement a material portion of the student's IEP where the school failed to provide the 15 hours of ABA therapy required by the IEP and the staff did not understand or use proper ABA techniques).

Simply put, a FAPE, to which a child with a disability is entitled, is the education that any student without disabilities would receive.  *See D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs*, 706 F.3d 256, 260–61 (4th Cir. 2013) ("Public schools are only required to make a FAPE available on equal terms to all eligible children within their district.").  The IEP is "individualized" or "personalized" to ensure that a child can access that education, considering his or her individual or personal cognitive and developmental capabilities and needs.  It must be appropriate, but it need not be the best possible education.  *See Endrew F.*, 137 S. Ct. at 999; *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982); *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014).  Indeed, the IDEA only requires that the IEP be "reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.  As the ALJ explained in her well-reasoned decision, the IEPs and proposed placements at Bells Mill and Cabin John were reasonably calculated to provide A.H. with a FAPE for the 2015-18 school years.

In sum, Plaintiffs have not shown that "the public school system failed to provide a free appropriate public education."[6] *See Carter*, 950 F.2d at 161. Therefore, Plaintiffs are not entitled to judgment as a matter of law, whereas Defendants are.

## ORDER

Accordingly, it is, this 8th day of February, 2019, hereby ORDERED that

1. Plaintiffs' Motion for Summary Judgment, ECF No. 10, IS DENIED;

2. Defendants' Cross-Motion for Summary Judgment, ECF No. 14, IS GRANTED; and

3. The Clerk IS DIRECTED to CLOSE THIS CASE.


_____/S/_____
Paul W. Grimm
United States District Judge

---

[6] Because the Court concludes that the IEPs and proposed placements were reasonably calculated to provide A.H. with a FAPE, the Court need not address Plaintiffs' argument that the ALJ erred in finding that the Parents had no intention to place the Student anywhere but at Ivymount. *See* Pls.' Mem. 45-47.